United States District Court
Southern District of Texas
**ENTERED**
May 03, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FRANCISCO ORTEGA GARCIA, | § | |
| Individually and as Surviving Spouse of | § | |
| Patricia Guadalupe Garcia Cervantes, | § | |
| and as Successor to the Estate; and as | § | |
| Next Friend of V.S.O.G., a Minor Child | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:17-cv-28 |
| | § | |
| UNITED STATES | § | |
| OF AMERICA et al., | § | |
| Defendants. | § | |

## MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pending before the Court are various motions filed by the parties seeking distinct types of relief. *See* Dkt. Nos. 109, 114, 115, 117, 118, 120. For the reasons provided below, it is recommended that: (1) Plaintiffs' products liability claims[1] be **DISMISSED** for lack of subject-matter jurisdiction; (2) Plaintiffs' negligence-based claims[2] be **DISMISSED** for failure to state a prima facie case; (3) Plaintiffs' wrongful death claims be **DISMISSED**; and, (4) that all other pending motions[3] be

---

[1] This includes all claims related to alleged design defects, strict products liability, and products liability based on theories of negligence.

[2] This includes all claims based on the actions/omissions of members of the Coast Guard crew, "failures to warn," and "inadequate instructions."

[3] At the time this Report and Recommendation is being filed, the following motions are deemed pending before the Court: Dkt. Nos. 109, 114, 115, 117, 119, 120, 121, 125, 140, 142, 143, 146, 149, 152, 174, 180, 182, 183, 184, 186, 190, 191, 192, 193, 194, 195.

**DISMISSED** as moot.  It is further recommended that the Clerk of Court be directed to close this case.

## I.    Background

This case is about the death of Patricia Guadalupe Garcia Cervantes (hereinafter, "Cervantes") on or about April 23, 2015.  That night, Cervantes was swimming in the Brownsville Ship Channel (hereinafter, the "Channel") when she was struck by a United States Coast Guard Law Enforcement Vessel, the "CG 33124."  Cervantes died following the impact.  Her body was discovered the next day.  On February 3, 2017, Francisco Ortega Garcia (hereinafter, "Garcia") filed this lawsuit individually, as the purported surviving spouse of Cervantes, as the purported successor to Cervantes' estate, and as next friend of his and Cervantes' minor child, V.S.O.G (hereinafter, collectively, the "Plaintiffs").    Initially, Plaintiffs only sued the United States (hereinafter, the "United States" or the "Government").    Plaintiffs subsequently added claims against Safe Boats International, LLC (hereinafter, "Safe Boats") and Mercury Marine, a division of Brunswick Corporation (hereinafter, "Mercury Marine"), to this civil action.  Safe Boats produced the CG 33124—the vessel that struck Cervantes—pursuant to a contract with the United States.  Mercury Marine manufactured the three engines, which included propellers, outfitted on the CG 33124 at the time of the incident.  Plaintiffs bring a series of products liability claims, negligence claims, and wrongful death claims against the collective Defendants.

### A. The Government's Acquisition of CG 33124

In August of 2006, the Government issued a Request for Quotation (hereinafter, the "RFQ") inviting businesses to bid on a contract to produce up to ninety-five vessels. Dkt. No. 109-3. A "Specification" was attached to the RFQ, setting out standards for the proposed vessel designs and providing information about the Government's needs in terms of minimum requirements and performance. *Id.* at 8–63. The RFQ and Specification were developed by various "stakeholder offices within the Coast Guard," including "a Naval architect," "somebody from electronics," "engineers," "boatswain's mates," and "the program office and the sponsor's office." Dkt. No. 109-2 at 9. Both the RFQ and Specification were developed over the course of several months before being published for the Government to invite public bids. *Id.* at 11–12.

Multiple bids were submitted in response to the RFQ and Specification, including a bid from Safe Boats. A "Technical Evaluation Team" from the Government, composed of the same stakeholders who drafted the RFQ and Specification, then evaluated the proposals. Dkt. No. 109-2 at 31–32. The Technical Evaluation Team memorialized its process in both a "Technical Evaluation Worksheet" and a "Technical Evaluation Report." Dkt. No. 109-2 at 32–40; Dkt. No. 109-6; Dkt. No. 109-7. The contract was awarded to Safe Boats, resulting in a "Blanket Purchasing Agreement" between Safe Boats and the Government. Dkt. No. 109-2 at 28–29. Once Safe Boats produced the contracted-for vessels and delivered them, the Government conducted acceptance trials. Dkt. No. 109-2 at 50; *see also* Dkt. No. 112-6 at 31–32

(describing the Government's conditions on acceptance of the vessels). The CG 33124 underwent these trials and was accepted. The Government determined that the CG 33124 complied with all terms of the Blanket Purchasing Agreement when Safe Boats delivered it. Dkt. No. 109-2 at 40, 47.

At the time the CG 33124 was transferred from Safe Boats to the Government, it was outfitted with three 275-horsepower engines. Dkt. No. 117-6 at 3. Those engines bore the following serial numbers: 1B465712, 1B460122, and 1B465707. *Id.* Some time after delivery of the CG 33124, those engines were replaced with three 300-horsepower engines, bearing the serial numbers: 1B968050, 1B979881, and 2B036644. Dkt. No. 117-3 at 2–4. The latter set of engines powered the CG 33124 on April 23, 2015. *Id.* The record does not indicate how or by whom the engines were replaced, except that Safe Boats avers it did not install the new engines. *See* Dkt. No. 120-2 at 2–3.

### B. The Incident

On the evening of April 23, 2015, four members of the Coast Guard (hereinafter, the "crew") embarked on a routine law enforcement patrol in the Channel aboard the CG 33124. Dkt. No. 117-4 at 1. The crew consisted of a certified coxswain, a break-in-coxswain, a boarding officer, and a crewmember. *Id.* at 5. That same evening, Cervantes and a man named Galdino Jose Ruiz-Hernandez were swimming in the Channel, attempting to enter the United States from Mexico without detection from law enforcement. Dkt. No. 125-1. They did not have any noise-making or illuminating equipment to alert others of their presence in the Channel.

As the crew was patrolling the Channel, the break-in-coxswain requested permission from the coxswain to bring the CG 33124 up onto plane.[4]  Prior to coming up, the coxswain and break-in-coxswain scanned the water ahead of them and "did not see anything in the water prior to coming up."  Dkt. No. 117-4 at 9.  The coxswain granted permission for the break-in-coxswain to come up onto plane, and the break-in-coxswain accelerated the CG 33124 to a speed at or slightly above 30 knots.  Dkt. No. 117-4 at 8.  During or shortly after this transitory period, at approximately 11:09 p.m., the crew heard a noise, described as a "thud/thump," on the hull of the vessel.  *Id*.  The coxswain likened the noise to "driving in calm water and [hitting] a small wake."  *Id*. at 53.  The boarding officer compared the noise "to the sound of going over a wake."  *Id*. at 61.

After hearing the "thud," the break-in-coxswain stopped the vessel, doubled back toward where the impact occurred, and began searching in the water.  Dkt. No. 117-4 at 8.  Prior to coming up and throughout the search, the CG 33124's navigation lights were illuminated.  *Id*.  The coxswain utilized the vessel's spotlight to search the water.  *Id*.  Ultimately, the crew located a small pink innertube.  *Id*. at 8−9.  The boarding officer stated that "once [they] found the inner tube, it made sense that [the thud] was the sound like if you hit an inner tube."  *Id*. at 61.  The crew did not see any other objects, debris, or people in the water, and determined that the inner tube had caused the noise.  *Id*. at 9, 53−54, 60−61.  They continued conducting their

---

[4] When a vessel is "planing," it is "near or on top of the water."  Dkt. No. 117-4 at 8, n.5.  The purpose of planing is "to achieve better maneuverability and performance."  *Id*.  The phrase "come up" or "come up on to plane" refers to the process by which the power of the engine is increased, causing the vessel to transition from displacement mode to planing mode.  *Id*.

routine patrol and returned to the Coast Guard Station on April 24, 2015, at approximately 12:40 a.m. *Id.* at 1. Upon their return, the crew reported the incident to officials within the Coast Guard, including showing their superior officers the inner tube. *Id.* at 10, 54.

Later that morning, at approximately 6:10 a.m., a Shrimp Basin complex security guard was approached by Ruiz-Hernandez, who reported seeing a body washed up along the north shore of the Channel. Dkt. No. 117-4 at 9. The guard conducted a search, but did not locate a body. *Id.* Ruiz-Hernandez did not accompany the guard on his search. Some time later that morning, the Port of Brownsville Police Department (hereinafter, the "PBPD") received an anonymous call about a body and its exact location on the shore of the Channel. *Id.* When the PBPD went to search for the body, Ruiz-Hernandez approached the officers to say he had made the call. *Id.* at 10−11. Ruiz-Hernandez stated he had been with the decedent, attempting to smuggle her into the United States, when she was struck by a vessel. Dkt. No. 142-4 at 9. Three days later, an autopsy was conducted, revealing that the injuries on the decedent's body were consistent with the shape of the CG 33124's propeller blades. Dkt. No. 117-4 at 10. The coroner determined that the decedent, Cervantes, "died nearly instantly because of the initial blunt force trauma and blood loss." *Id.* In the weeks and months after Cervantes' death, the Government conducted an investigation which was summarized in a Major Incident Investigation Report ("MII Report"). Dkt. No. 112-2. The MII Report was completed on July 14, 2015, and copies of it have been submitted to the Court. Dkt. Nos. 112-2, 117-4, 139-3, 142-4.

## C. Procedural History

Since its inception, this lawsuit has been riddled with avoidable problems: failure

of the parties to communicate or respond to one another,[5] unclear legal theories,[6] and

disorganized filings[7] with the Court.  While the Court understands the responsibility

of attorneys to zealously advocate on behalf of their clients, such zealousness should

not become a hindrance to securing the swift, clear resolution of claims.

Plaintiffs filed the instant action against the United States on February 3, 2017.

Dkt. No. 1 (hereinafter, Plaintiffs' "Initial Complaint").   The Initial Complaint

---

[5] For instance, Plaintiffs' counsel failed to respond to the United States' discovery requests, thereby requiring the Court to set a hearing.  Dkt. Nos. 47, 48.  Because Plaintiffs' counsel did not respond to the United States' Motion to Compel, the Court ordered Plaintiffs' counsel "to submit an advisory to the Court stating the position he will take at the" hearing.  Dkt. No. 53.  Yet again, Plaintiffs' counsel did not respond.   In a different instance, the parties filed motions requesting and opposing the extension of discovery deadlines, notwithstanding the Court's insistence that it *would not intervene* in discovery beyond the deadline provided in the Scheduling Order.  *See* Dkt. Nos. 86, 88, 90, 91.   The parties were reminded that they were "not only able, but encouraged, to seek resolution of any discovery-related conflicts without the intervention of the Court."  Dkt. No. 94.  At times, because the parties failed to confer, this Court ordered the filing of amended certificates of conference or struck motions as non-compliant with the Local Rules of this District.  *See, e.g.*, Dkt. Nos. 105, 124.  In addition, counsel has filed multiple certificates of conference averring that other attorneys did not respond to them.  *See* Dkt. No. 104 at 9; Dkt. No. 184 at 4; Dkt. No. 186 at 4.  Although it is unclear whether the lack of response had been a result of the filing attorney providing inadequate time to receive a response or the fault of the responding parties, the Court finds this lack of communication troubling.

[6] Crucial components of this case were not briefed or addressed by any party, thereby requiring the Court to order the parties to file advisories.  *See* Dkt. Nos. 130, 148.  Though the Court recognizes that ordering such advisories is within its discretion, it is concerning that the parties only addressed key issues—such as subject-matter jurisdiction—after being prompted to do so by the Court.

[7] Several instances serve to highlight these filings: Safe Boats and Plaintiffs filed a National Transportation Safety Board Report in violation of 49 U.S.C. § 1154(b).  Upon motion by the United States, the Court struck this prohibited filing.  *See* Dkt. No. 81 (Motion to Strike); Dkt. No. 96 (Order granting Motion to Strike).  Plaintiffs' counsel filed four separate expert reports as attachments to the Plaintiffs' Expert Witness List.  Dkt. No. 97.  However, roughly three weeks later, Plaintiffs' counsel filed a Motion to Strike those expert reports, because they were "inadvertently filed."  Dkt. No. 101.  The Court subsequently struck those exhibits.  Dkt. No. 102.  Additionally, Safe Boats submitted unsealed documents to the Court containing the full name of V.S.O.G.  Dkt. No. 152.  Safe Boats was then ordered to re-file the exhibit with the minor child's name redacted.  Dkt. No. 153.

includes claims brought by Garcia in various capacities: (1) individually; (2) as Cervantes' surviving spouse; (3) as successor-in-interest to Cervantes' estate; and (4) as next friend of V.S.O.G.—his and Cervantes' child.[8]  *Id.*  The United States first answered on May 5, 2017.  Dkt. No. 13.  On September 29, 2017, with leave of the Court (Dkt. No. 27), Plaintiffs filed their "First Amended Complaint." Dkt. No. 28. The First Amended Complaint added products liability claims against Mercury Marine and Safe Boats related to purported design defects of the CG 33124 and its propeller.  *Id.* at 9−13.

On June 18, 2018, Plaintiffs filed a "Motion for Leave to Amended (sic) Complaint" on grounds that Plaintiffs had "additional facts to add to [their] Complaint."  Dkt. No. 74.  The Court granted leave (Dkt. No. 83), and Plaintiffs' "Second Amended Complaint" (Dkt. No. 84) was filed on July 6, 2018.  In response, the United States filed a Motion to Dismiss, primarily arguing that it had not waived sovereign immunity for the claims that Plaintiffs brought against it.  Dkt. No. 109.  Safe Boats has filed multiple motions seeking summary judgment on specific issues.  *See* Dkt. No. 114 (Punitive Damages); Dkt. No. 115 (Garcia's Lack of Standing); Dkt. Nos. 117, 118 (Proximate Cause); Dkt. No. 120 (Government Contractor Defense).  Mercury Marine has joined Safe Boats' Motion for Summary Judgment on Proximate Cause. *See* Dkt. No. 119.

---

[8] The Court notes that Defendants have challenged Garcia's status as Cervantes' "surviving spouse" and "successor-in-interest."  *See* Dkt. Nos. 115, 116.  At this time, the Court does not express an opinion regarding the legal status—or lack thereof—of the relationship between Garcia and Cervantes.

## II.    Jurisdiction

From the outset of this case, there has been disagreement between the parties over the jurisdictional bases of Plaintiffs' claims.  In their Initial Complaint, Plaintiffs invoked both the Federal Tort Claims Act ("FTCA") and, alternatively, the Suits in Admiralty Act ("SIAA") as possible bases for subject-matter jurisdiction.  Dkt. No. 1 at 2−3 (citing 28 U.S.C. §§ 1346(b), 2671−80 and 46 U.S.C. §§ 30901−13, respectively).  Then, in their First Amended Complaint, Plaintiffs added 28 U.S.C. § 1332 (a)(1) as yet another basis for subject-matter jurisdiction.  Dkt. No. 28 at 3.  In their Second Amended Complaint, Plaintiffs again cite the FTCA, the SIAA, and diversity of citizenship as three separate bases for subject-matter jurisdiction.  Dkt. No. 84 at 3 (citing 28 U.S.C. §§ 1346(b), 2671−80; 46 U.S.C. §§ 30901−13; and 28 U.S.C. § 1332(a)(1), respectively).

Due to the consequences of designating a case as an admiralty proceeding, the Court ordered each party to file an advisory addressing whether the Court's admiralty jurisdiction had been invoked on any or all of Plaintiffs' claims.  Dkt. No. 130.  Each party complied.  *See* Dkt. Nos. 134, 136, 137, 138.  The United States and Mercury Marine both advised the Court that the claims made against each of them were brought pursuant to the Court's admiralty jurisdiction.  *See* Dkt. No. 134 at 2; Dkt. No. 137 at 3.  Plaintiffs also informed the Court that they were "electing to bring this suit under admiralty."  Dkt. No. 138 at 5.  Safe Boats, however, took the "position that Plaintiff[s] clearly elected not to proceed against Safe Boats in admiralty."  Dkt. No. 136 at 7.

Whether a case or claim proceeds in admiralty depends in part on whether the plaintiff properly designated the action as such.  "There are special procedures for invoking the admiralty jurisdiction of a federal district court," and those procedures are set forth in Rule 9(h) of the Federal Rules of Civil Procedure.  *Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1547 (5th Cir. 1991); FED. R. CIV. P. 9(h). That rule states:

> (1) How Designated. If a claim for relief is within the admiralty or maritime jurisdiction and also within the court's subject-matter jurisdiction on some other ground, the pleading may designate the claim as an admiralty or maritime claim for purposes of Rules 14(c), 38(e), and 82 and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. A claim cognizable only in the admiralty or maritime jurisdiction is an admiralty or maritime claim for those purposes, whether or not so designated.

> (2) Designation for Appeal. A case that includes an admiralty or maritime claim within this subdivision (h) is an admiralty case within 28 U.S.C. § 1292(a)(3).

FED. R. CIV. P. 9(h).

Rule 9(h) identifies two types of admiralty cases: (1) those that fall exclusively under admiralty jurisdiction; and (2) those that fall under admiralty jurisdiction as well as under some other form of federal subject-matter jurisdiction.  In the first category, the plaintiff need not make an explicit statement invoking admiralty jurisdiction.[9]  In the second category, the plaintiff may elect to proceed under a court's admiralty jurisdiction, or proceed based on a different theory of subject-matter jurisdiction.  *Concordia Co., Inc. v. Panek*, 115 F.3d 67, 70 (1st Cir. 1997); *Fedorczyk*

---

[9] If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether or not it is so identified.  FED. R. CIV. P. 9(h)(1); *see also Baris*, 932 F.2d at 1547; *Trentacosta v. Frontier Pacific Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir. 1987).

*v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir. 1996); *Baris*, 932 F.2d at 1547;

*Alleman*, 756 F.2d at 345.

In the second type of case, the issue is "how specific a party must be in identifying an admiralty claim in a complaint when that party is pleading alternative theories of subject matter jurisdiction." *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 256 (3d Cir. 1998).  Although the preferred method of making an admiralty election is explicit reference to Rule 9(h), the absence of such language is not dispositive.  *See Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 345 (5th Cir. 1991) (noting the "preferred technique is to expressly invoke Rule 9(h)," but that in the Fifth Circuit, "a party need not make a specific reference to Rule 9(h) in order to fall under . . . admiralty jurisdiction"); *see also Borque v. D. Huston Charter Servs., Inc.*, 525 F. Supp. 2d 843 (S.D. Tex. 2007).  Rather, whether a complaint sufficiently invokes admiralty jurisdiction is evaluated based on the totality of the circumstances,[10] including the "parties' manifestation of intent" as demonstrated by their pleadings and actions. *Foulk*, 144 F.3d at 256–57.

Here, the Court is called upon to consider all relevant circumstances to determine whether Plaintiffs have shown an intent to proceed in admiralty or at law.  "One important factor in determining whether a claimant has elected to proceed in admiralty is whether he demanded a jury trial." *Concordia*, 115 F.3d at 72 (citations omitted).  Whether such a demand was made is probative because a plaintiff who has invoked admiralty jurisdiction is not entitled to a jury trial.  *See* FED. R. CIV. P. 38(e); *Concordia*, 115 F.3d at 70–71; *Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054

---

[10] *Bodden v. Osgood*, 879 F.2d 184, 186 (5th Cir. 1989).

(9th Cir. 1997).  Courts interpret the absence of a demand for a jury trial as support that a plaintiff with an admiralty claim intends to proceed under admiralty jurisdiction rather than at law.  *See Rachal v. Ingram Corp.*, 795 F.2d 1210 (5th Cir. 1986) (finding that the initial complaint with a Jones Act claim and a jury demand was an election to proceed at law; however, the amended complaint, which omitted the jury demand, properly invoked admiralty jurisdiction).  Plaintiffs here did not include a jury demand in any of their three Complaints.  *See* Dkt. Nos. 1, 28, 84. While not dispositive, this absence of a jury demand evinces Plaintiffs' intention to proceed in admiralty.

Plaintiffs' Advisory regarding their desire to proceed in admiralty (Dkt. No. 138) is also probative.  Although Plaintiffs' Advisory alone is not determinative of whether the case proceeds in admiralty or at law, the Court accords due weight to the clear manifestation of their intent.  The Court finds that the Plaintiffs did intend to proceed in admiralty, and will address the jurisdictional bases for Plaintiffs' claims, although not in the order presented.

### A. Claims Brought Against the United States

The United States is immune from suit unless it has waived its sovereign immunity, thereby consenting to be sued.  *See, e.g.*, *United States v. Thompson*, 98 U.S. 486, 489, 25 L. Ed. 194 (1878).  Absent an express waiver of sovereign immunity, federal courts lack subject-matter jurisdiction over suits against the United States. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941).

When an admiralty claim is brought against the United States, the SIAA[11] and the Public Vessels Act[12] ("PVA")—rather than the FTCA—are the mechanisms through which the United States has waived sovereign immunity. *Williams v. Central Gulf Lines*, 874 F.2d 1058, 1062 (5th Cir. 1989), *cert. denied*, 493 U.S. 1045, 110 S. Ct. 843, 107 L. Ed. 2d 837 (1990); *Trautman v. Buck Steber, Inc.*, 693 F.2d 440, 445 (5th Cir. 1982) (quoting *Kelly v. United States*, 531 F.2d 1144, 1149 (2d Cir. 1976)); *see also McCormick v. United States*, 680 F.2d 345, 349 (5th Cir. 1982); *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 145 (5th Cir. 1971); 8 MICHAEL B. MCCAULEY & FRANK P. DEGIULIO, BENEDICT ON ADMIRALTY § 1.06(D) (Rel. 67–5/95 Pub. 130).

The PVA allows civil, in personam admiralty actions to be brought against the United States for "damages caused by a public vessel of the United States." 46 U.S.C. § 31102(a)(1). A vessel that is owned and operated by the Government falls squarely within the scope of the PVA. *See Pascua v. Astrocielo Neptunea Armandora, S.A.*, 614 F. Supp. 984, 985 (S.D. Tex. 1985); *Helgesen v. United States*, 275 F. Supp. 789 (S.D.N.Y. 1966). The PVA applies whether the alleged tortious acts were committed by crewmembers or the vessel itself. *Pascua*, 614 F. Supp. at 985; *Motors Ins. Co. v. United States*, 239 F. Supp. 121 (S.D.N.Y. 1965); *Page v. United States*, 105 F. Supp. 99 (E.D. La. 1952); *The Roah Hook*, 64 F. Supp. 288 (E.D.N.Y. 1945). Suits brought under the PVA are "subject to the provisions of [the SIAA] except to the extent inconsistent with" the PVA. 46 U.S.C. § 31103.

---

[11] 46 U.S.C. §§ 30901 et. seq.

[12] 46 U.S.C. §§ 31101 et. seq.

B. *Claims Purportedly Brought Against Mercury Marine and Safe Boats*

A federal court's authority to hear admiralty cases is rooted in the Constitution, which "extend[s]" federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST., art. III, § 2. Congress reiterated that authority in a statute giving federal district courts "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction[.]" 28 U.S.C. § 1333(1). A party seeking to invoke federal admiralty jurisdiction over a tort claim pursuant to 28 U.S.C. § 1333(1) must demonstrate that the alleged tortious activity: (1) occurred on navigable water, or the injury suffered on land was caused by a vessel on navigable water; and (2) bears a connection with maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995); *see also Sisson v. Ruby*, 497 U.S. 358, 110 S. Ct. 2892, 111 L. Ed. 2d 292 (1990).

1. *The Locality Requirement*

In the instant case, the locality element of the test for admiralty jurisdiction is satisfied. The incident underlying this suit—the death of Cervantes—took place on navigable water. Further, the instrumentality that caused her death—the CG 33124—was on navigable water at the time of the incident. *See Ayers v. United States*, 277 F.3d 821 (6th Cir. 2002) (finding admiralty jurisdiction where the improper operation of a lock caused the drowning death of a swimmer, because both the swimmer and the lock were on navigable water).

## 2. The Connection/Nexus Requirement

The connection element has two components.  First, a court must "assess the general features of the type of incident involved" to determine whether the incident has "a potentially disruptive impact on maritime commerce." *Sisson*, 497 U.S. at 362−63.  Second, a court must consider whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." *Id.* at 365.

Here, the "type of incident" underlying Plaintiffs' suit is a death which occurred as a result of a collision between a mechanically-powered vessel and a swimmer in a commercial ship channel, along an international maritime border.  So characterized, the incident clearly has the potential to affect maritime commerce.  In general, rescue and recovery efforts result from this type of incident.  Where, as here, the rescue and recovery would occur on a highly trafficked ship channel, near a boat ramp, on an international maritime border, commercial activity may experience significant interruption.[13]

Courts next consider whether the alleged tortious activity was substantially related to traditional maritime activity.  *Grubart*, 513 U.S. at 539.  Plaintiffs' claims sounding in products liability satisfy this component of the connection test.  For claims with a less-than-obvious connection to traditional maritime activity, the Fifth Circuit considers four factors to determine whether this component is satisfied: (1)

---

[13] The test for admiralty jurisdiction articulated in *Grubart* considers not whether commercial disruption did or did not occur; rather, the test focuses on the potential for disruption based on the general character of the incident.  513 U.S. at 538.

the functions and roles of the parties, (2) the types of vehicles and instrumentalities involved, (3) the causation and type of injury, and (4) traditional concepts of the role of admiralty law. *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S. Ct. 1991, 40 L. Ed. 2d 558 (1974).

Applying those four factors to Plaintiffs' claims purportedly brought against Mercury Marine and Safe Boats, they clearly fall under this Court's admiralty jurisdiction. Mercury Marine and Safe Boats are both involved in producing, designing, and/or manufacturing vessels for maritime activity. Additionally, the instrumentalities which collided with Cervantes—the CG 33124 and the three 300-horsepower engines' propellers—are of a maritime character. Cervantes' injuries and the alleged cause of those injuries are both related to maritime activity. The fourth and final *Kelly* factor requires courts to balance "the national interest in uniformity of the law governing the care and safety of those engaged in maritime service" against "the demands of federalism and the interest in preventing the displacement of state law where similar claims have traditionally been relegated to local resolution." *Woessner v. Johns-Manville Sales Corp.*, 757 F.2d 634, 643 (5th Cir. 1985). The overriding concern of the maritime law is the federal interest in uniformly developed laws regarding maritime industry, and the manner that vessels may properly move upon navigable waters. *See Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 93 S. Ct. 493, 34 L. Ed. 2d 454 (1972); *see also Foremost Insurance*, 457 U.S. at 677. The instant case implicates these uniquely federal interests. Taken together, the four *Kelly* factors support a finding that the claims Plaintiffs bring

against Mercury Marine and Safe Boats are properly within this Court's admiralty jurisdiction.

## III.   Applicable Law

"With admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986).  Pursuant to the Preemption Clause of the Constitution, federal law preempts any conflicting state law.  U.S. CONST., art. VI, cl. 2.   The Supreme Court has explicitly allowed for the application of state law when it serves to supplement, but not contravene, the general maritime law, and the state law fills a gap therein.  *See, e.g.*, *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 116 S. Ct. 619, 133 L. Ed. 2d 578 (1996).  There are limits, however; a state law may not supplement the general maritime law where the state law: (1) conflicts with an applicable law of Congress, (2) materially prejudices a characteristic feature of the general maritime law, or (3) interferes with the proper harmony and uniformity of the general maritime law in its international and interstate relations.  *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216, 37 S. Ct. 524, 61 L. Ed. 1086 (1917).

General maritime law is "'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules,' drawn from both state and federal sources." *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 878, 117 S. Ct. 1783, 138 L. Ed. 2d 76 (1997) (citing *East River S.S. Corp.*, 476 U.S. at 865).   Even though maritime suits are governed by federal substantive and

procedural law, courts *may* adopt state law by either express or implied reference when state law does not conflict with federal law. *Palestina v. Fernandez*, 701 F.2d 438, 439 (5th Cir. 1983).

The Supreme Court and the Fifth Circuit apply Section 402A of the Restatement (Second) of Torts to maritime products liability cases. *See Saratoga Fishing*, 520 U.S. at 879; *see also Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir. 1987) (applying § 402A to a design defect claim). Negligence is also an actionable wrong under the general maritime law. *See Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005) (internal citations omitted). The elements of a maritime negligence cause of action are essentially the same as those for non-admiralty negligence claims under the common law. *Id.* Those elements are: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the plaintiff sustained damages, and (4) the defendant's wrongful conduct caused the plaintiff's damages. *Id.*; *see also* In re *Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (internal citations omitted). With these principles in mind, the Court now turns to the substance of Plaintiffs' claims for relief.

## IV.    Products Liability Claims

One set of claims that Plaintiffs bring relate to the design and sale of the CG 33124. They contend that the CG 33124 was defective because of forward visibility obstructions when the boat came up on to plane and the lack of a propeller guard. Dkt. No. 84 at 10, 13. Plaintiffs also contend that both Mercury Marine and Safe

Boats had a duty to warn the United States about these alleged defects. *Id.* at 11−12, 14−15. Plaintiffs purport to bring these claims against Mercury Marine and Safe Boats, since they manufactured the engine/propeller and produced the vessel, respectively. However, there are myriad issues with Plaintiffs' products liability claims, rendering them unsustainable.

As noted above, Section 402A of the Restatement (Second) of Torts provides the standard for these causes of action. That Section provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) [the product] is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (AM. LAW INST. 1965).

The most glaring issue in the instant case is that sellers and manufacturers are only liable for defective products that cause physical harm to the "ultimate user or consumer." Critically, Cervantes does not fall into either of these categories. She is more properly categorized as a "casual bystander" or an individual whose contact with the product(s) was incidental. Comments l and o to § 402A explicitly state that products liability has not been expanded to cover these categories of injured parties. *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. l, cmt. o (AM. LAW INST. 1965) ("Casual bystanders, and others who may come in contact with the product, as in the case of . . . a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery."). Plaintiffs do not cite to a single case in the

general maritime law, and the Court has uncovered none, that permits a non-user or non-consumer to recover on products liability grounds.

Even if Cervantes were somehow determined to be a "user or consumer," the claims would fail because the United States has not waived subject-matter jurisdiction for such claims. Although Plaintiffs purport to bring these claims against Safe Boats and Mercury Marine, it is clear the boats were constructed and delivered pursuant to a government contract. It is the decisions of the United States—as documented in the RFQ, the Specification, and the acceptance trials—that are at the heart of the Plaintiffs' products liability claims.

Although the SIAA and the PVA—the statutes which provide jurisdiction over the United States for this suit—do not contain any express exceptions to the waiver of sovereign immunity, the FTCA does contain an express exception with respect to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This express exception, commonly referred to as the "discretionary function exemption," has been incorporated into the SIAA and PVA. *See Wiggins v. United States,* 799 F.2d 962, 964 (5th Cir. 1986); *Gemp v. United States,* 684 F.2d 404 (6th Cir. 1982); *Estate of Callas v. United States,* 682 F.2d 613, 619−20 (7th Cir. 1982); *Canadian Transport Co. v. United States,* 663 F.2d 1081, 1085−86 (D.C. Cir. 1980); *Chute v. United States,* 610 F.2d 7 (1st Cir. 1979), *cert. denied*, 446 U.S. 936, 100 S. Ct. 2155, 64 L. Ed. 2d 789 (1980). Thus, even though Plaintiffs' claims against it are

brought pursuant to the SIAA and the PVA, the United States has not waived its sovereign immunity if the discretionary function exception applies.

The Supreme Court has set forth a two-part test to determine whether conduct is encompassed by the discretionary function exception, thereby preserving the United States' sovereign immunity from suit. *See Berkovitz v. United States*, 486 U.S. 531, 535−36, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988) (applying the discretionary function exception in the context of the FTCA); *see also Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) (applying the two-part test in the SIAA context).  The challenged conduct must: (1) involve an element of judgment or choice, and (2) that judgment or choice must be based on considerations of public policy.  *Campos v. United States*, 888 F.3d 724, 730−31 (5th Cir. 2018); *Ashford v. United States*, 511 F.3d 501, 504−05 (5th Cir. 2007).  For the exception to apply, both prongs must be met.  In considering these two elements, the question of whether the Government was negligent is irrelevant.  *Gonzalez v. United States*, 851 F.3d 538, 543 (5th Cir. 2017).  With respect to the first prong, "[i]f a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."  *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010).  By contrast, "[t]he requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991)

(quoting *Berkovitz*, 486 U.S. at 536).  In assessing the second prong, courts "consider whether the actions taken are 'susceptible to policy analysis.'"  *Gibson v. United States*, 809 F.3d 807, 812 (5th Cir. 2016).  "[T]he proper inquiry . . . is not whether [the official] *in fact* engaged in a policy analysis when reaching his decision but instead whether his decision was 'susceptible to policy analysis.'"  *Spotts*, 613 F.3d at 572 (quoting *Gaubert*, 499 U.S. at 325); *accord* In re *FEMA Trailer Formaldehyde Prod. Liab. Litig. (Louisiana Plaintiffs)*, 713 F.3d 807, 810 (5th Cir. 2013).

Here, the Government exercised discretion during the design and acquisition process, pursuant to which CG 33124 was built.  Government stakeholders spent months developing, vetting, and finalizing the RFQ and Specification.  Dkt. No. 109-2 at 10–12.  That same group of stakeholders conducted an extensive review process, and accepted Safe Boats' bid, resulting in the execution of the Blanket Purchasing Agreement.  After the contracted-for vessels were built, the Government tested them to ensure compliance at the time of delivery.  Plaintiffs have not cited a single limitation on the Government's discretion at any of these decision points, nor are any such limitations revealed in the record.  These procedures exemplify the sort of decision-making process that requires the "exercise of authority."

Each of the aforementioned Government decisions was also "susceptible to policy analysis" because of their relation to military strategy, effectiveness, and preparedness.  It has long been recognized that military design decisions fall squarely within the discretionary function exemption.  *See, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988) (reasoning that "the

selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function" because these decisions involve "judgment as to the balancing of many technical, military, and even social considerations" such as "the trade-off between greater safety and greater combat effectiveness").  Further, where the Government opts not to alter a product once it has been provided for military use by a private company, the Fifth Circuit has held that the decision to leave a product "as-is" is protected by the discretionary function exemption.  *See Baldassaro v. United States*, 64 F.3d 206 (5th Cir. 1995).  In sum, the Government's design decisions—including the decision to utilize unguarded propellers on the CG 33124—are all protected by the discretionary function exemption.  Even assuming arguendo that Cervantes was a "user or consumer" of the product at issue here, the Court still does not have subject-matter jurisdiction over these products liability claims, and, accordingly, the claims should be dismissed.

## V.      Negligence Claims

### A.  Claims Against the United States for Acts/Omissions of the Coast Guard Crew

Plaintiffs bring a set of claims alleging that the Coast Guard crew's negligent conduct resulted in Cervantes' death.[14]  As noted *supra*, a plaintiff bringing maritime negligence claims must demonstrate that the defendants owed a duty to the plaintiff,

---

[14] Plaintiffs have submitted evidence regarding the training and experience of the Coast Guard crew, and referenced the crew's lack of experience in passing.  In its Motion to Dismiss, the United States addressed these arguments, contending that the "discretionary function exception shield the United States' decisions regarding governmental training programs."  Dkt. No. 109-1 at 21.  In response, Plaintiffs explicitly stated that they are not bringing "improper training/supervision claims" against the United States.  *See* Dkt. No. 112 at 9−10.

that the defendants breached that duty, that the plaintiff suffered damages, and that the defendant's allegedly wrongful conduct caused the plaintiff's damages. *See Withhart*, 431 F.3d at 842; s*ee also* In re *Great Lakes*, 624 F.3d at 211.

The existence of a "duty" and to whom that duty is owed are both questions of law. In re *Great Lakes*, 624 F.3d at 211. Whether the defendant owes a duty to the plaintiff "depends on a variety of factors, 'most notably the foreseeability of the harm suffered by the complaining party.'" *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 377 (5th Cir. 2000) (quoting *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987)). Said differently, duty "is measured by the scope of the risk that negligent conduct foreseeably entails." *Consol. Aluminum*, 833 F.2d at 67 (quoting Harper, James & Grey, *The Law of Torts, Scope of Duty in Negligence Cases* § 18.2 at 655 (2d ed. 1986)). In the context of maritime torts, the Fifth Circuit has defined the concept of foreseeability as follows:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

*Consol. Aluminum*, 833 F.2d at 68.

Here, Plaintiffs have failed to allege a prima facie case of negligence against the United States in two respects. First, although they have amended their complaint twice during the more-than two years that this case has been pending, Plaintiffs have failed to identify what duty the crew owed Cervantes. The only attempt Plaintiffs make to meet this prima facie burden is to state that the "crew had a duty . . . to not cause personal injury or death by their own wrongful or negligent acts or omissions."

Dkt. No. 84 at 9.  Plaintiffs add that the "crew further had a duty to act with due care, including, but not limited to, following appropriate policies and procedures and to not allow a situation to develop which would cause the death of another human being." *Id.*  This reasoning is entirely circular.  Plaintiffs have not identified or defined for the Court what duty the crew owed to Cervantes, other than the tautological conclusion that since a death occurred, *some* duty must have been violated.

Second, even if Plaintiffs had identified a legal duty, they have not shown that Cervantes was in the class of persons to whom that duty would be owed.  Under the principles of negligence law, "a tortfeasor is accountable only to those to whom a duty is owed." *Consol. Aluminum*, 833 F.2d at 67.  "The critical inquiry is the foreseeability of the injury to" the injured party.[15]  *Id.*  Plaintiffs fail to address this element whatsoever.  *See* Dkt. No. 84 at 7–9 (setting out Plaintiffs' causes of action for negligence and wrongful death against the United States).  Any attempt to argue that Cervantes' presence in the Channel was foreseeable would be belied by the record. The MII Report notes that, "[b]ased on training and experience, the crew's attention was focused on the shoreline under the assumption that undocumented aliens and smugglers . . . would be aware of the Coast Guard boat's presence, and would wait until the boat passed before entering the water."  Dkt. No. 112-2 at 14.  The MII

---

[15] As one legal scholar framed it, "All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect *some* persons under *some* circumstances against *some* risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises."  Wex S. Malone, *Ruminations on Cause-in-Fact*, 9 STAN. L. REV. 60, 73 (1956) (emphasis in original).

Report elaborates that "despite regular Coast Guard patrols of the [Channel], no Coast Guard member . . . interviewed by the Board had actually encountered undocumented aliens, or any other individuals, swimming across the [Channel] in that area during the night." *Id.* Plaintiffs do not address how, considering this information, Cervantes' presence in the Channel and her resulting death were foreseeable.[16]

In sum, Plaintiffs have failed to allege even a prima facie case of negligence at this late stage of their lawsuit. Plaintiffs do not allege that the presence of swimmers in the Channel in the middle of the night was foreseeable, nor do they identify the existence of a specific duty that the crew violated. Without such allegations, and with unrefuted evidence to the contrary in the record (Dkt. No. 112-4), Plaintiffs' negligence claims against the United States should be dismissed.

### B. Claims Against Mercury Marine and Safe Boats

Plaintiffs also bring claims against Mercury Marine and Safe Boats for alleged "failure to warn/inadequate instructions or warnings." In their Second Amended Complaint, Plaintiffs contend that both Mercury Marine and Safe Boats "had a duty to provide the [Government] with post-sale warnings and instructions and failed to do so." Dkt. No. 84 at 12, 15. In maritime failure-to-warn cases, as in other negligence-based maritime torts, courts apply general principles of negligence law. *See Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir. 1980). Under these

---

[16] Plaintiffs do provide evidence suggesting that members of the crew were aware of some drug and human smuggling activity in the Channel (*see, e.g.*, Dkt. No. 163-6); but none of that evidence addresses whether the smugglers were in boats or swimming, whether the activity took place at night, or whether smugglers typically donned some illuminating device.

principles, "a defendant's failure to warn *the plaintiff* does not breach" the duty of care "unless the resultant harm is reasonably foreseeable." *Daigle*, 616 F.2d at 827 (emphasis added). Yet again, Plaintiffs have failed to allege a prima facie case. Plaintiffs do not claim that Mercury Marine or Safe Boats had a duty to warn Cervantes—or any of the Plaintiffs—of any harm. On the contrary, Plaintiffs claim that the "duty to warn" or "duty to provide adequate instructions/warnings" existed between Safe Boats and the Government, or between Mercury Marine and the Government. In other words, if there were a breach of some duty to warn, it would be the United States—not any of the Plaintiffs—that may have a cause of action against Mercury Marine or Safe Boats.[17] Because Plaintiffs have again failed to make the basic allegations necessary for a prima facie case, all claims related to Mercury Marine's and Safe Boats' "failure to warn" or "inadequate instructions/warnings" should be dismissed.

## VI.   Wrongful Death Claims

Plaintiffs also bring wrongful death claims against the United States, Mercury Marine, and Safe Boats. Dkt. No. 84 at 9, 16. Wrongful death actions provide recovery where the death was caused by the tortious conduct of another person or legal entity. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 925, cmt. a (AM. LAW INST. 1965) (explaining that the American common-law action for "wrongful death" derives from the English tradition, which provides "a cause of action against the one who

---

[17] Although the United States would be the "proper plaintiff" for these "failure-to-warn" claims, the Court does not express an opinion on whether such claims would succeed.

*tortiously* caused the death") (emphasis added); *accord Wrongful death*, WOLTERS KLUWER BOUVIER LAW DICTIONARY (2012).   Where, as here, Plaintiffs have not adequately alleged a cause of action for any underlying tortious conduct, they cannot maintain an action for wrongful death.  *See* TEX. CIV. PRAC. & REM. § 71.003 (stating that wrongful death actions can be brought "only if the individual injured would have been entitled to bring an action for the injury if the individual had lived"); *see also Yamaha Motor Corp.*, 516 U.S. at 215 (holding that state statutes govern wrongful death actions where the decedent was a non-seafarer and the death occurred on navigable waters).  Plaintiffs have failed to demonstrate that Cervantes would have had a cause of action had she survived; these claims, then, are subject to dismissal.

## VII.   Recommendation

For the reasons stated above, it is recommended that:

(1) Plaintiffs' products liability claims[18] be **DISMISSED** for lack of subject-matter jurisdiction;

(2) Plaintiffs' negligence-based claims[19] be **DISMISSED** for failure to state a prima facie case;

(3) Plaintiffs' wrongful death claims against all parties be **DISMISSED**; and

(4) All pending motions[20] be **DISMISSED** as moot.

It is further recommended that the Clerk of Court be directed to close this case.

---

[18] This includes all claims related to alleged design defects, strict products liability, and products liability based on theories of negligence.

[19] This includes all claims based on "failures to warn" and "inadequate instructions," as well as all claims against the United States based on the acts/omissions of members of the Coast Guard crew.

[20] "Pending motions" refers to the following: Dkt. Nos. 109, 114, 115, 117, 119, 120, 121, 125, 140, 142, 143, 146, 149, 152, 174, 180, 182, 183, 184, 186, 190, 191, 192, 193, 194, 195.

## VIII.    Notice to Parties

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*; 28 U.S.C. § 636(b)(1).

**SIGNED** this 2nd day of May, 2019, at Brownsville, Texas.

_____

**Ignacio Torteya, III**
**United States Magistrate Judge**